1-1970 Cosenza v. Kijakazi. We're going to begin with oral argument from the appellant and I'll recognize Ms. Meeks. Good morning, Your Honors. Kathryn Meeks for Appellant Jamie Cosenza and her son JF. The ALJ in this case incorrectly denied disability benefits to JF, a young adult who suffers from severe and lifelong learning disabilities. This court should grant JF's unopposed motion to join this case as a party because his participation fully resolves any question of whether this court has subject matter jurisdiction. On the merits, the court should remand for a new hearing because the ALJ repeated the same analytical errors that compels the court to vacate the ALJ's disability determination in Hopgood v. Astru. If he becomes a party, if we grant the motion, given that he's an adult we use you agree we use his full name rather than his initials at this point? That's correct, Your Honor. Yes. And are you still arguing that Ms. Cosenza has standing on her own? We do. Because she initiated this case as a representative of her son we think that the court doesn't need to inquire into her own standing and can look through to her son's standing and that's sufficient. But under the facts of this case we think she has her own Article 3 standing. And that's because... Have you found any cases, sorry to interrupt Ms. Meeks, but have you found any cases where a parent of an adult child has Article 3 standing in this capacity? You cite a bunch of cases about representative payees, but they don't discuss the standing in particular. Sure. The cases that address the parents representing the children, they recognized that the parents had standing. This factual scenario arises so infrequently, yes, that we don't have a case on point, but we cited the Access Living versus Uber case, which recognizes a similar theory that diversion of a party's resources can be sufficient for Article 3 standing. And here the fact that JF lives in the same household as Ms. Cosenza, there's no dispute that she provides for all of his basic needs and we think it's very likely she would serve as a representative payee under the who examined JF in connection with the disability application concluded that he would require a payee. And the regulations say that a payee should be a relative who has the claimant's best interests at heart. And because she lives in the same household as JF, she could co-mingle any benefits with her own funds. And this set of facts we think is sufficient to give her her own Article 3 standing. But because the motion to add JF to this case is unopposed, we think that's a simple means of disposing of any question about whether the court has jurisdiction here. So your argument is clearly far and above a no harm no follow argument. You're saying there's actual aspects of an Article 3 standing. Yes, we think that Ms. Cosenza has her own standing, but the we've asked to join JF. As long as one party has standing to seek relief, and the only relief we're seeking here is vacature and a remand for new hearing, as long as one party has standing, that's sufficient and the court doesn't need to separately inquire into whether any other party has standing here. So turning back to the merits, I'd like to address the acquiring and using information domain. If the ALJ had found a marked rather than a moderate impairment in this domain, that would have been sufficient for a finding of disability. As in Hopgood, the ALJ concluded that JF had a less than marked impairment because she blamed his struggles in school on his behavior and attendance issues, which she characterized as personal choices. But the ALJ ignored the issues were actually symptoms of his disability rather than a volitional choice. So I'd like to walk the court through a few examples of evidence that the ALJ completely overlooked. So at Appendix 42, a school occupational therapist found that JF's attention and behavior in the classroom were caused by his difficulty with sensory modulation. At Appendix 64, a 2010 school report concluded that his significant behavior problems resulted from an emotional disability. At Appendix 66 and again at Appendix 241, two different individual education plans or IEPs attributed JF's significant behavior issues to his educationally based diagnosis of Asperger syndrome. And then finally at Appendix 251, a 2016 teacher report concluded that his lack of organization in the classroom was intrinsic. So even under a deferential substantial evidence standard, the ALJ can't ignore highly pertinent evidence that's favorable to the claimant and that's exactly what happened in this case. We think the ALJ made a second error straight out of Hopgood when she relied on modest improvements that JF made on individual assignments to conclude that he had a less than market impairment in acquiring and using information. But she failed to explain how, if at all, she accounted for the fact that JF achieved these improvements only with substantial accommodations, including longer amounts of time to take tests, frequent breaks, the use of a scribe to help with written test answers. The ALJ was supposed to compare JF to peers who did not require accommodations, but she overlooked evidence that his performance in school was, to use the words from a school report, significantly discrepant from that of his peers. So for example, the ALJ completely overlooked evidence at Appendix 227 that standardized tests in 2016, which was his last year of high school, placed him in the bottom first percentile nationally for reading and the bottom second percentile for math. At Appendix 47, a 2010 school report reported nearly the exact same results. The test placed him in the bottom fifth percentile nationally for reading and the bottom first percentile for math. At Appendix 62, other standardized tests from 2010 placed JF in the extremely low and borderline categories for reading and math, which were two standard deviations below the national mean. And under the regulations, two standard deviations below the mean is evidence of a market impairment. That's at 20 CFR 416 926A. So under a straightforward application of Hopgood, we think that this evidence that the ALJ overlooked justifies remand and a new hearing. Let me ask you this. Do you think if Ms. Kozinza had updated the record with records from his adult years, that would have helped her case in any way? And you know, what should we think about that as we evaluate the ALJ's disability determinations on the adult side? Because she's taking all this, drawing all these records. The child record. So there was a consultative examination when he was an adult by Dr. Lana, who had concluded that he had extreme difficulties in interacting and relating with others. If the case were remanded for a new hearing, I think Ms. Kozinza and JF would welcome the opportunity to supplement the record. But the ALJ didn't reject the disability claim on the ground that the representation at the hearing, that any new evidence would likely be cumulative of what was already in the record. The ALJ had asked if a school counselor, if she would be permitted to send a questionnaire to a school counselor, and Ms. Kozinza's view was that the school counselor had already signed the IEPs that were in the record, so it would likely be cumulative. But as I said, I the opportunity were given. So beyond the errors I discussed... Ms. Meeks, why aren't, as you know, the standard of review here is substantial evidence. And the ALJ's opinion was pretty detailed. And on the question of acquiring and using information, she relied on teacher evaluations. She relied on the IEP documents themselves, recognizing that he certainly had challenging issues, but noting that his behavior regularly impacted his academic career. She relied on his own statements from the hearing, which you're asking us to discredit, but we can't re-weigh testimony. She relied on the state psychologist's opinion. She noted his standardized scores had improved. So unlike in other cases, there's a lot of information that she relied on here, acknowledging some of the deficiencies, but ultimately reached her conclusion. It sounds like you're asking us to re-weigh that. Sure. So the ALJ's opinion is quite long. It's 78 pages, but it's very repetitive. She sort of summarizes this evidence and then cuts and pastes it and repeatedly discusses it in the context of different... True. She relies on the same evidence for different things, but I'm focusing on really the two challenges that you have had made here. Her discussion is pretty detailed and relies on very specific evidence on the acquiring and using information. So her actual analysis is quite perfunctory. It's limited to just a single paragraph for that factor. That's at the short appendix 30 and the short appendix 47. And although the ALJ discussed the teacher reports, we think that she completely overlooked this evidence that I discussed a few moments ago that was favorable to JF. And in her actual analysis, she relied on teacher reports that said, for example, he had behavior issues and attendance issues that didn't explain why she credited that evidence instead of other evidence in the record that was not discussed that attributed those issues to his disability. So the ALJ, she's not required simply to acknowledge that the evidence exists. She's supposed to build a logical bridge between the evidence and the record in her conclusions. And here the ALJ in her one paragraph, just kind of with her ultimate decision on the evidence, didn't explain why she rejected certain evidence and credited other evidence. And Judge St. Eve, you asked about the claimant's testimony when he was 12 years old at the hearing. He said he could be a straight-A student but was just fooling around. In other parts of her opinion, the ALJ didn't credit the claimant's testimony. She said she thinks the record doesn't support the extreme limitations alleged by the disability determination, and yet accepted this sort of damaging testimony from a 12-year-old boy who was given leading questions by the ALJ who asked him several times, you know, isn't this your fault? And he sort of capitulated and said yes. Did you want to reserve the rest of your time for rebuttal? Yes, thank you, Your Honor. Thank you, Ms. Meeks. We'll now move to argument from the Court. Good morning, Your Honors. May it please the Court. Lindsay Payne on behalf of the Acting Commissioner of Social Security. With respect to the jurisdictional issues in the case, if the Court does grant the motion to bring JF into the case, that would resolve the Article 3 standing issue raised by the Commissioner. So the... And you don't object to that motion, correct? We do not object to him being a party to the case. Correct, correct. And so the only question before the Court on that issue is whether Mr. Freed should be joined or should be substituted. As set forth in the briefing, the Commissioner questions whether it's appropriate for Ms. Cosenza to remain in the case, but will defer to the Court's judgment on that issue. And you agree that you've waived your objection based on the real party and interest as to Ms. Cosenza. We certainly agree that that is an issue that the Commissioner should have raised in the District Court. This Court has made some statements in the past about prudential standing being sort of in between as far as whether it's completely waivable. Appellant has agreed that it is still within this Court's power at any time to add or drop a party. But as far as the Commissioner's position goes, yes, we should have raised that earlier and so we will just defer to the Court. As long as he is brought into the case, there is nothing that would stand in the way of this Court's jurisdiction. Turning to the merits of the case and childhood disability in The key to the childhood disability issues in the case lie in the six domains that comprise the functional equivalence analysis for childhood disability. And what appellant's argument here is really missing and failing to acknowledge is the separation between those different domains. A child satisfies the criteria for disability if he has marked limitations in two domains or extreme limitations in one domain. This is not a nebulous inquiry wherein all of the child's symptoms and behaviors are lumped together in one pot. The domains are clearly broken down and they require separate findings under the regulatory scheme. So here the ALJ found that as a child, JF had marked limitations in just one domain that was attending and completing tasks and she found less-than-marked limitations in all of the other domains. Appellant has only challenged two findings by the ALJ. Those would be the findings of less-than- marked limitations in acquiring and using information and less-than-marked limitations in interacting and relating with others. So the question always has to return to whether substantial evidence supported the ALJ's findings on those two particular points with respect to those two domains. In her lengthy discussion, the ALJ amply supported those findings. Even here today in appellant's argument before the court, it's unclear how the behavioral problems appellant is referencing relate to the domain of acquiring and using information that's being argued about. So counsel referenced sensory modulation, lots of behavior problems. The ALJ accounted for those in her finding that JF had marked limitations in attending and completing tasks and also that he had some limitations but less-than-markedly so in acquiring and using information and in socially interacting. The support provided for the ALJ's findings and the breakdown between the domains is really where the distinction from the findings comes in here. In Hopgood, the ALJ disregarded certain behaviors that the child had because the ALJ found that they were volitional choices. Here, the ALJ considered them and attributed them to the various domains. In doing so, she relied on specific record evidence, primarily from JF's teachers, to determine that while he had marked limitations in attending and completing tasks, he had less-than-marked limitations in the other domains. I am unable on the fly to compare all of the specific record citations given by counsel in argument here to the ALJ's 78-page decision. Some of them do, though, seem to be information that the ALJ did discuss. The ALJ did discuss the, for testing, and how JF was able to improve his scores from year to year, showing that he was acquiring and using information. Well, let me ask you about one specific example that's related to improvement, but this is grades, and it comes directly out of Hopgood, where the ALJ talked about the claimants improving grades over time but, our court held, failed to account for the fact that the claimant was in special education courses, and that teachers were having to accommodate him, and these accommodations were happening at the same time. Can you talk about that in this particular case, the interplay between special education, which JF is in, the courses, and his claim of disability? Because I don't see that in the ALJ's decision. I don't see where the ALJ's improved in 12th grade. You know, he's got all these other failing grades from all these other years, and so sure, they may have improved in 12th grade, but he also is in these special education courses where teachers are accommodating him, where he doesn't have to produce 100% of the work, just like the claimant in Hopgood, okay, and where less is expected of him in those courses. So can you talk about how the ALJ handled that? Absolutely. I think the ALJ's decision demonstrates that she was well aware of the IEP documents. She talked about how JF was in special education, and where this case differs from Hopgood is the the wealth of information that the ALJ had here about what JF's own teachers were saying about his functioning in the classroom, and what the reason was for his problems. Certainly any sort of problem relating to any of the domains that a child could have could impact their grades. So for example, a child with significant health problems who's unable to attend school regularly due to a physical condition could have a significant impact on their grades. So the ALJ here really had to get to the bottom of which domains were affected for JF. She had very specific information from his teachers. As the ALJ discussed, for example, the sixth grade teacher, Ms. Williamson, stated that when JF was motivated, he showed very little problems acquiring and using information, and that he was capable of learning new material and applying problem-solving skills when it suited him. His seventh grade teacher, Ms. Moss, generally indicated only slight problems in acquiring and using information. His eighth grade teacher, Mr. Cooper, pointed to a lack of effort and focus as the cause of JF's academic difficulties. JF consistently tested in the range of low average to average intelligence. While he was sometimes, and this goes again to your question, Your Honor, while he was sometimes noted in school records to be working one to two grade levels behind in his curriculum, he was also at times noted to be working at grade level. So this is looking specifically at what is he able to achieve as far as math and reading in comparison to his peers who are not in special education courses, and he was able to either be at grade level or be one to two grade levels behind in what he's achieving, which is a separate question from the grades that he earns, which in part rely upon him actually turning in assignments. While he showed problems completing his homework and attending school, he also showed that he could earn passing grades on his homework and that his grades improved as his attendance improved. It wasn't unreasonable on these facts with the record before her for the ALJ to find moderate rather than marked limitations in acquiring and using information, but that JF had more significant problems with attending and completing tasks. I'd also point out counsel in her argument referenced the ALJ not considering an alleged diagnosis of autism in this case. There is no diagnosis of autism in this case that was extensively litigated. We have record evidence of Ms. Cosenza telling Mr. Freed's pediatrician that he had autism caused by vaccines despite there being no autism diagnosis in the Mr. Freed had normal psychiatric and behavioral findings. And so what is an educationally based diagnosis of Asperger's? What's the what's the work that educational is doing in that phrase? My understanding from the record is simply that Ms. Cosenza told the support personnel at the school that JF had autism and they accepted that. There's there's no comprehensive evaluation by any sort of professional of JF that would substantiate a diagnosis of autism and there has not been any argument that the ALJ erred in her finding that he had only two medically determinable impairments which were a vitamin deficiency and an unspecified learning disorder. This also ties into the Hopgood analysis and also appellant's argument in the reply brief which cites to the regulations and to various district court cases arguing that the ALJ here impermissibly failed to consider that JF's impairments could impact multiple domains that any one good given impairment might impact multiple domains. But the ALJ's decision here proves otherwise. They cite to 20 CFR section 416.926 a which states any given impairment may have effects in more than one domain. In a social security case in impairment is a term of art. Mr. Freed was only found to have those two medically determinable impairments. Notwithstanding that fact the ALJ found based on those two impairments that JF had limitations in every single one of the six childhood domains showing that the ALJ understood that impairments can and do affect multiple domains. It was Mr. Freed's burden. Sorry. Since he moved to join I started using his name in my head with JF. It was JF's burden to show how the evidence actually compelled a finding of market as opposed to moderate limitations in these other two domains and he failed to do so. As the appropriate at this stage of the litigation for the evidence to be reweighed when it was already fairly considered by the ALJ. That goes same for the adult disability analysis. Here the ALJ's decision essentially amounts to a finding that JF failed to meet his burden with respect to the adult disability analysis. He'd had no medical or mental health treatment as an adult. In fact no treatment records after 2012 were provided and it appears that none exist because JF denied being in any sort of treatment other than the special education supports that he received in school. On his mother's advice he refused to cooperate with expanding the record. That was something that went up and down multiple times in the administrative record in hearings across three different years. I would disagree with the sentiment that Ms. Kacenza and Mr. Freed are likely to agree to further record expansion. Even the educational records that we have in the record after 2012 were not received directly from the school. Rather Ms. Kacenza printed out what she had. She submitted them to the agency and refused to submit anything else. Was there any indication of why that happened? Or any finding as to why that happened? That they didn't exist, they would have been helpful, didn't want to be cooperative, all of the above? There was a lot of back and forth between Ms. Kacenza and the ALJ wherein Ms. Kacenza was debating sentence four versus sentence six remands under 42 USC 405 G and she was asserting that the record was complete and with this type of remand it shouldn't be updated. The ALJ repeatedly tried to inform her that the ALJ was required to assess JF's functioning as of the date of that hearing. She wouldn't cooperate but at the end of the day it is the claimant's burden to prove disability. Here there is a complete lack of evidence of his functioning as an adult other than the the examination by Dr. Lana. I think we've detailed the deficits with respect to that examination and the allegations that JF made there for example about hallucinations and things like that that he's never before and never again alleged that reasonably called into question the results of that examination. So for all of these reasons we'd ask that the court affirm. Thank you Ms. Payne. Ms. Meeks we'll give you three minutes on rebuttal. Very briefly as to the Commissioner's argument about the educationally based diagnosis of Asperger's syndrome it was not in fact based on Ms. Kacenza's personal report to the school starting at page 28 of the appendix. The school psychologist Karen Funk performed testing and the results from the Gilliam Asperger's disorder scale are in the record. They found a high a high slash probable chance that he suffered from Asperger's syndrome but our point is that the ALJ is not that the ALJ should have found a diagnosis of Asperger's syndrome. She found that he had a severe medically determinable impairment and that was his learning disability. Our point in bringing up this evidence was simply that his teachers the school psychologists recognized that his behavior problems were not the result of his volitional choices but they attributed them to this disability. What's your best argument on the adult issue other than Dr. Lana's report? Ms. Kacenza testified that his condition was essentially unchanged so beyond supplementing the record with additional medical evidence his condition as an adult remains the same as it did as a child and the ALJ herself found it you know special appendix 69 that his medically determinable impairment was both severe and lifelong and was unlikely to change. There's also resource issues with this family. I think part of the reason that there's not additional medical evidence is that there are this type of care is expensive and he received treatment as a child through the school psychologist and that was why the you know the family relied on on those reports from school. The Commissioner has argued that it's not clear how the behavior issues related to the domain of acquiring and IQ scores fell in the low average range but his grades were abysmal they were consistently C's D's and F's all throughout his schooling that he must be putting in a lack of effort because of this supposed discrepancy between his grades and his IQ score but there's abundant evidence in the record which I discussed in my opening that the behavioral issues that caused the bad grades weren't simply volitional choices but were in fact a symptom of the disability. So we thank your honors for your consideration and ask the court to remand for a new hearing before the ALJ. Thank you. Thank you Ms. Meeks. Thank you Ms. Payne. The case will be taken under advisement.